ATLAS PRODUCTS CORPORATION y ROBERT STEINBERG ET AL., demandantes-recurridos, recurrentes, *v.* GERARDO ARROYO TORO, demandado-recurrente, recurrido.

*Número:* 12667   *Resuelto:* 30 de marzo de 1962

*Orlando J. Antonsanti,* abogado del demandado-recurrente, recurrido; *F. Fernández Cuyar,* abogado de los demandantes-recurridos, recurrentes.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Dávila.

PER CURIAM: Gerardo Arroyo Toro y Atlas Products. Corporation celebraron un contrato para que la segunda administrara una tenería, propiedad del primero, localizada en Mayagüez. Surgieron diferencias entre las partes. Robert Steinberg,[1] como cesionario de Atlas demandó a base de que Arroyo había quebrantado el contrato, reclamando las ganancias dejadas de percibir con motivo del incumplimiento de Arroyo. Arroyo por su parte contrademandó a base de que era Atlas la parte culpable y que ésta le había ocasionado pérdidas. El tribunal inferior declaró con lugar la demanda y sin lugar la contrademanda, condenando al demandado a

[1] Steinberg además estaba interesado en Atlas y de hecho es la persona que a nombre de Atlas celebró el contrato con Arroyo.

pagar $44,596.80 más costas y $10,000 para honorarios de abogado de los demandantes por encontrar que había sido temerario el demandado al haber litigado y negado el incumplimiento del contrato. Ambas partes recurrieron ante nos, pero Arroyo no impugnó aquella parte de la sentencia que declaró sin lugar la contrademanda.

Para analizar debidamente las obligaciones impuestas por el contrato y calibrar las actuaciones de los contratantes procede una detallada exposición de lo acontecido.

Alrededor de 1942 Gerardo Arroyo Toro había comprado una finca y como parte del negocio adquirió una tenería establecida en ella. La tenería al principio estaba diseñada y equipada sólo para la fabricación de cuero *vegetal*.[2] En 1945 Arroyo contrató los servicios de un experto, el señor Lee Soesbe, para que reorganizara la planta y adquiriera el equipo necesario para manufacturar cuero al *cromo*.[3] Equipada ya la planta se contrataron los servicios de un estudiante norteamericano del Instituto Politécnico de San Germán, el señor Charles Chase, quien se trasladó a los Estados Unidos para tomar un breve adiestramiento en la manufactura de cuero al cromo. Cuando Chase regresó se le encomendó la dirección de la planta. La prueba demuestra que Chase, a pesar de haber adquirido ciertos conocimientos básicos, no elaboraba un producto satisfactorio. Su desconocimiento técnico le obligaba a escribir con mucha frecuencia al señor Soesbe, solicitando consejos. A pesar de ello no se logró mejorar la calidad del producto. Así las cosas, el señor Arroyo empezó a hacer gestiones para conseguir que una empresa americana con amplia experiencia en este campo se hiciera cargo de operar su tenería. Comenzó a discutir con

---

[2] Cuero vegetal es el curtido mediante la acción del jugo de cortezas agrias. El producto es un cuero resistente y se usa principalmente para la suela de zapatos.

[3] Cuero al cromo es el curtido con sales de cromo especialmente sulfato de cromo y bicarbonato de potasio y soda. El cuero así curtido es el que se usa en la parte superior de los zapatos por ser de más fina calidad.

Steinberg Bros., empresa localizada en la ciudad de Nueva York que se dedicaba a la manufactura de guantes, la posibilidad de llegar a un acuerdo. Su principal accionista el señor Robert Steinberg, se trasladó a Puerto Rico, inspeccionó la tenería, y luego de varias reuniones se otorgó el siguiente contrato el 21 de enero de 1949 para ser efectivo el 1ro. de marzo siguiente:

1.—El señor Arroyo era dueño de una tenería localizada en Mayagüez conocida como Tenería Arroyo. Era el único dueño de todos los edificios, equipo y maquinaria y garantizaba que el negocio tenía activos corrientes netos por lo menos con igual valor a los que figuraban en un estado de situación de fecha 31 de julio de 1948.

2.—Atlas era una corporación organizada por personas con experiencia en la operación del negocio de fabricación de guantes y explotación de tenería y se dedicaría en Puerto Rico a la manufactura de guantes.

3.—Arroyo se comprometía a entregar y Atlas convenía en asumir y ejercitar completo control y administración de dicho negocio, teniendo la facultad, entre otras, de contratar, despedir y supervisar todos los empleados, agentes, etc..

4.—Arroyo se comprometía a hacer todos los actos en representación de la administración (firma de cheques, contratos, etc.) y conducir aquellas negociaciones y procedimientos y cumplir con todo aquello que se le requiriera por la administración y fuera adecuado y necesario.

5.—Las ganancias y las pérdidas se distribuirían en partes iguales.

6.—Atlas se comprometía a comprar todo el "finished grain chrome leather" ([4]) que se fabricara a un precio de veintitrés centavos por pie, disponiéndose que siempre que la piel de vaca aumente o disminuya de catorce centavos por libra entonces el precio de venta se ajustaría correspondientemente.

---

([4]) Cuero el cromo terminado usado para la fabricación de guantes.

7.—Atlas se comprometía a comprar todo el "split leather" (⁵) que se produjera a diez centavos el pie.

8.—Si los salarios mínimos o el costo de los productos químicos necesarios para la elaboración de cuero al cromo aumentaban o disminuían por más de un diez por ciento y causaba que el costo de manufactura se afectase proporcionalmente entonces el precio del cuero se reajustaría para compensar el aumento o disminución.

9.—Atlas se comprometía a operar, controlar y administrar el negocio de una manera eficiente, y aportar su experiencia para aumentar y mantener el nivel de ganancias teniendo, entre otras, la facultad de nombrar un superintendente de vasta experiencia en la administración de negocios similares.

10.—El contrato tendría un período de vigencia de doce años.

11.—El contrato entraría en vigor el 1ro. de marzo de 1949 y las partes verificarían un inventario en esa fecha.

12.—Dentro de un período de seis semanas después de la fecha efectiva del contrato Arroyo adelantaría $50,000 para ser utilizados como capital de operación en el negocio.

13.—En cualquier momento antes del 1ro. de marzo de 1950 Atlas tendría una opción de comprar una participación en el negocio hasta un cincuenta por ciento.

14.—De no hacerlo así, Atlas tendría la opción de terminar el contrato en cualquier momento meramente dando un aviso de su intención con 30 días de anticipación, sujeto entonces a la obligación de comprar todo el "finished grain chrome leather" producido o en proceso de producción.

15.—Arroyo se comprometía a adelantar para la compra de equipo adicional, ciertas cantidades que no excedieran de $10,000, cuando Atlas lo requiriese.

---

(⁵) Es el cuero sobrante del corte que se le da al cuero para que resulte de un espesor uniforme.

Este fue el contrato que según los demandantes fue quebrantado por Arroyo. El tribunal de instancia concluyó que el demandado había violado el contrato y para sostener su conclusión hizo las siguientes determinaciones de hechos:

"(a) El contrato en cuestión comenzó a regir en marzo 1, 1949. Una de las obligaciones asumidas por Arroyo en el mismo consistía de entregar a Atlas el control, la posesión, y la administración total de la tenería y de su negocio, incluyendo la autoridad total y exclusiva de emplear y despedir los funcionarios, empleados y agentes. El mismo día primero de marzo de 1949, Arroyo quebrantó esta obligación al emplear un tenedor de libros, llamado Cancio, y al fijarle un salario de $40.00 semanales, sin notificar de ello a Atlas.

(b) En los primeros días del mes de marzo de 1949, Arroyo, por su cuenta y sin siquiera notificar a Atlas, vendió a una firma de Boston, Massachusetts, unas veinte mil libras de pieles de vaca. Exhibit 39 de los demandantes. Las pieles de vaca constituyen la materia prima que se utilizaba en Tenería Arroyo para la manufactura de cuero. Tal actuación por parte del demandado constituyó una violación del contrato, ya que era su obligación contractual entregar a Atlas la operación y administración de todas estas propiedades y de todos los actos y transacciones en conexión con las mismas, habiendo Atlas asumido la obligación de pagar la mitad de las pérdidas que resultasen durante su administración. Disponer a favor de un tercero en esta forma de gran cantidad de materia prima, sin notificar ni obtener el consentimiento de Atlas, en efecto impedía una operación eficiente del negocio por Atlas.

(c) En el contrato de autos Arroyo representa y asegura que el activo neto corriente de Tenería Arroyo es por lo menos igual al revelado por el balance que se acompañó al contrato y que tiene fecha de julio 31 de 1948. A fin de comprobar este hecho, tan pronto entró en vigor el contrato Atlas requirió de Arroyo la entrega de un balance de Tenería Arroyo. (sic) Tal balance era necesario para comprobar la situación económica del negocio al comenzar el contrato y para establecer la base sobre la cual pudiera determinarse después ganancias o pérdidas. El demandado nunca entregó a Atlas dicho balance, quebrantando así también sus obligaciones bajo el contrato en tanto en cuanto se obligó a entregar a Atlas la administración y operación total

de las propiedades de Tenería Arroyo. Habiendo concluido anteriormente que Arroyo había dispuesto de veinte mil libras de pieles, resulta fácil concluir que el balance, nunca entregado, a marzo 1, de 1949, hubiese demostrado que el activo neto corriente de la Tenería no era igual en marzo 1ro. de 1949, que el revelado por el balance de julio 31 de 1948 que se acompañó al contrato.

(d) En marzo 31 de 1949, Atlas requirió de Arroyo que prescindiese de los servicios de dos empleados, William Martínez y Cancio, y que transfiriese a otro empleado, Chino a funciones de compra de pieles y venta de cuero, eliminando su salario de $40.00 semanales y dándole una compensación de $25.00 semanales más comisión del 2% sobre las ventas que hiciese. Bajo el contrato, como hemos visto, Atlas tenía autoridad exclusiva para emplear, supervisar y despedir empleados. No obstante ello, Arroyo se negó a cumplir tales instrucciones y retuvo a Martínez y a Chino en las mismas posiciones y con los mismos salarios de antes, violando así una vez más el contrato en este respecto. En varias ocasiones posteriores Arroyo, intervino con los obreros de la Tenería cambiándoles sus turnos de trabajo y en junio 3 de 1949, destituyó a uno de los empleados, todo ello sin siquiera notificar a Atlas. Finalmente, en junio 6 de 1949, Arroyo notificó al propio Lobaugh que quedaba destituido y que no se le pagaría más su sueldo.

(e) En mayo 26 de 1949, sin consultar ni notificar a Atlas, Arroyo redujo el precio de venta del cuero que había en la Tenería de 47 centavos a 42 centavos por libra. Bajo el contrato Arroyo se obligó a entregar la operación y administración del negocio a Atlas exclusivamente. La fijación del precio es uno de los más importantes actos en la operación y administración de un negocio. Tal actuación de Arroyo constituyó otra violación adicional del contrato.

(f) Al comenzar la vigencia del contrato, Steinberg instruyó a Lobaugh para que tan pronto terminase la curtición que entonces estaba en proceso, procediese a curtir mil libras de cuero al cromo, debiendo llevarse a efecto la curtición con la fórmula de éxito ya probado, que se usaba en Estados Unidos, Lobaugh intentó cumplir dichas instrucciones varias veces y fue siempre impedido por Arroyo, quien no lo permitió en ninguna ocasión, alegando originalmente que primero tenía que llegar a un entendido con Atlas con respecto a inversiones y luego alegando que era él (Arroyo) quien daría las instrucciones sobre la operación

de la Tenería. Estas actuaciones de Arroyo igualmente que-brantaron su obligación contractual de entregar a Atlas control, posesión y administración total del negocio, así como la opera-ción [y] funcionamiento del mismo.

(g) Una de las cláusulas esenciales de este contrato dispone que Arroyo adelantaría, dentro de seis semanas después de marzo 1, de 1949, la suma de $50,000.00 para ser usada por Atlas como capital de operación en el funcionamiento del negocio. A pesar de haber sido requerido por escrito para cumplir dicha obligación, Arroyo nunca dió cumplimiento a la misma en forma o manera alguna. Adujo como excusa que ya había anticipado $40,000.00 en suministro y materiales, siendo falsa tal afirma-ción. También adujo como excusa su alegación de que Atlas no había 'organizado la planta' (Exhibit 11 de los demandantes) siendo frívola tal excusa, toda vez que fue el propio Arroyo quien impidió la organización de la planta por parte de Atlas. En las negociaciones que precedieron al contrato se hizo bien claro que habría de ser obligación de Arroyo suplir las cantidades de dinero que fuesen necesarias para operar adecuadamente el negocio (Exhibits B. y C. del demandado) advirtiéndosele a Arroyo que en vista del balance de Tenería Arroyo, se necesitaría capital de trabajo adicional (Exhibit D. del demandado). El incumpli-miento de esta cláusula del contrato por tanto fue en extremo sus-tancial y en efecto impidió a Atlas poder cumplir con su obliga-ción correlativa de operar y hacer funcionar la Tenería Arroyo eficientemente. Exhibit 10 de los demandantes."

La Tenería Arroyo tenía una competidora localizada tam-bién en Mayagüez situada a apenas un kilómetro de distancia, la Tenería González. Esta tenería tenía contratado los ser-vicios del señor Edwin Lobaugh ([6]) y por las propias admisio-nes de Lobaugh sus relaciones con los dueños no eran satis-

---

([6]) El señor Lobaugh declaró que él empezó en la industria de cuero en 1907. Según sus propias palabras, su experiencia ha sido la siguiente:

(a) Trece años con una fábrica en Ritchway Pennsylvania que no fa-bricaba cuero al cromo.

(b) Diecinueve años con una fábrica subsidiaria de la U.S. Leather Co. que fabricaba cuero vegetal y algún cuero al cromo. Trabajaba en el labo-ratorio y no en producción. El se dedicaba allí a la fase de cuero vegetal.

(c) Doce años con la American Oak Leather Co. que se dedicaba exclu-sivamente a la manufactura de cuero vegetal.

factorias ya que últimamente ellos habían rehusado seguir sus consejos y nadie obedecía sus instrucciones. La tenería González estaba en malas condiciones financieras y ya en 1948 Lobaugh se había acercado a Steinberg proponiéndole un negocio similar al de Arroyo. La tenería González se dedicaba exclusivamente a la elaboración de cuero vegetal. Aunque tenía varias piezas de maquinaria para la elaboración de cuero al cromo éstas no se estaban utilizando. La proposición de Lobaugh era que se dedicara la tenería González para cuero vegetal y la de Arroyo para cuero al cromo. Steinberg al

(d) Cinco años con Himmelain & Bailey cuya producción era como un cincuenta por ciento de cuero al cromo. Allí era superintendente y químico.

(e) Un año en Cuba. Allí no administró ninguna tenería y se dedicaba a la fase química.

(f) Cinco años con la firma de Owensound en Canadá como superintendente. Allí no se elaboraba cuero para guantes.

(g) Tres años con la Andrews Co. como supervisor técnico. Manufacturaban cuero vegetal y al cromo. No hacían cuero de guantes.

(h) Tres años con la tenería González en Puerto Rico que manufacturaba cuero vegetal exclusivamente.

El propio Lobaugh declaró que él nunca ha estado empleado en una firma que manufacturaba cuero para guantes. En repetidas ocasiones manifestó que él no es un experto en cuero al cromo y que así se lo manifestó a Arroyo. El señor Soesbe corrobora esto al afirmar que Lobaugh tiene fama entre los curtidores de ser uno de los mejores en la elaboración de cuero vegetal pero que nadie lo conoce como cualificado para trabajar cuero al cromo. La ineficiencia de Lobaugh como administrador surge por sus propias admisiones de que:

(1) No sabe cuántos tanques para "tanning" habían en González a pesar de estar allí tres años.

(2) No sabe el costo de los productos químicos.

(3) No sabe qué parte del costo de producción es el costo de los productos químicos.

(4) No calculaba qué por ciento de ganancia se lograba sobre la inversión.

(5) No sabe en qué proporción se deprecia la maquinaria de una tenería.

(6) No sabe cuánto cuestan los seguros.

(7) Desconoce qué por ciento de "rejects" (productos inservibles o con defectos sustanciales) había en tenería González y en tenería Arroyo.

(8) En la tenería González nunca comparó la producción por hora de cada empleado con la obtenida en tenerías en los Estados Unidos.

(9) No se acuerda si en tenería González calculó la producción promedio de cada empleado por hora.

principio no estaba interesado pero más tarde se interesó y el negocio llegó hasta la etapa en que se redactó un contrato similar al de Arroyo fechado el 1ro. de abril de 1949 aunque nunca se formalizó. Ya en diciembre 23 de 1948 según Lobaugh, Steinberg le había hablado para que fuera él el superintendente de tenería Arroyo. No se le notificó en ningún momento a Arroyo de los planes de Atlas de hacer un contrato similar con la tenería González y no fue hasta el 1ro. de marzo que Steinberg se presentó a la tenería Arroyo con Lobaugh informándole a Arroyo en esta ocasión que era Lobaugh el escogido para dirigir su empresa. Le informó también que debido a que Lobaugh todavía tenía un compromiso con la tenería González éste no podría dedicarle todo su tiempo a la tenería Arroyo y que solamente le dedicaría medio día hasta tanto se terminara de liquidar el otro negocio. Arroyo cuestionó inmediatamente si era aconsejable poner frente a su negocio a una persona que era el administrador de una competidora. Arroyo declaró que aunque levantó el punto no insistió en él al Steinberg llamarle la atención de que bajo el contrato ellos eran los que tenían la facultad de nombrar el administrador. Arroyo entonces condujo a Lobaugh y a Steinberg por toda la planta presentándole a los empleados. En esta ocasión se discutió la necesidad de construir una torre para almacenar agua y se acordó que sería Arroyo el que se encargaría de hacerla. De hecho esta torre se comenzó a construir inmediatamente y se terminó al mes. Se discutió la necesidad de construir 22 tanques adicionales para aumentar la producción. El señor Steinberg llevó al señor Levy, ingeniero, a la tenería González, le explicó cómo querían los tanques y luego fueron a la tenería Arroyo donde se discutió donde se iban a construir. Allí mismo Levy le dió un estimado aproximado de $9,000 a $10,000 y prometió darle uno definitivo más tarde. Steinberg nunca se lo solicitó y no fue hasta el 9 de abril que Levy lo envió a solicitud de Arroyo.

Para una mejor comprensión del problema que este caso presenta, pasemos a considerar la serie de hechos que eventualmente resultaron en el rompimiento de las relaciones entre Arroyo y Atlas. Lobaugh declara que cuando él se hizo cargo de la tenería lo único que estaba en proceso de elaboración era cuero vegetal. Se había dejado de curtir cuero al cromo. Inmediatamente que Lobaugh se hace cargo empieza a tomar un inventario que termina el 29 de marzo. Arroyo le da toda su cooperación. El mismo día que se termina el inventario Lobaugh le informa a Arroyo que no se va a procesar más cuero vegetal hasta que termine la elaboración del que está en proceso. La idea era limpiar todos los tanques para utilizar una nueva fórmula, pero que esta fórmula no se podía preparar hasta que llegaran unos productos químicos de los Estados Unidos. Aparentemente estos productos nunca se recibieron. Para el 30 de abril, el propio demandante admite que todavía no se habían recibido. Arroyo, quien hasta ese momento ha cooperado en todo, a pesar de su reserva inicial al conocer que la persona que iba a estar a cargo de la tenería era la misma que administraba la competidora, se niega a seguir lo propuesto. Manifiesta que en su fábrica no se va a conducir ningún experimento y que él tiene que comunicarse con Steinberg para plantearle su objeción.

A los dos días de este incidente, el 31 de marzo Arroyo recibe una carta de Steinberg en la cual le ordena despedir a dos empleados, Cancio y Martínez y transferir a otro, Lugo Cintrón de producción a otro departamento, reduciéndole el sueldo de $40 semanales a un dos por ciento de comisión en ventas, y permitiéndole girar contra sus comisiones hasta la suma de $25 semanales. En esta carta Steinberg le ratifica lo que le comunicó Lobaugh referente a no curtir más cuero vegetal y utilizar una nueva fórmula.

Arroyo contesta la carta a Steinberg el 4 de abril y le informa que no se puede despedir a Martínez ya que él tiene un contrato por tres años, de los cuales sólo ha transcurrido uno. Le recuerda que Steinberg tiene conocimiento de esto pues él se lo había informado cuando se llevaron a cabo las negociaciones para el contrato. En esta misma carta Arroyo le manifiesta que no está dispuesto a permitir que se haga nada más en la tenería hasta que se le envíen los números finales de una maquinaria adicional que se va a adquirir. Le comunica además que hasta ese momento no se ha hecho nada en la tenería, que todo va muy lento y que no se puede seguir perdiendo dinero como sucedió en el mes de marzo.

El 5 de abril Steinberg le escribe a Arroyo recordándole que de acuerdo con el contrato tiene que depositar $50,000 para capital de operaciones dentro de las primeras seis semanas. El 11 de abril Steinberg le escribe a Arroyo y le informa que está consiguiendo los estimados para la compra de la maquinaria adicional. En cuanto al empleado que Steinberg ordenó que suspendiera, le recuerda que Arroyo le había informado que sus servicios podían terminarse.

El 7 de abril los obreros de la tenería se declararon en huelga debido a que no había suficiente trabajo. Lobaugh telegrafió a Steinberg y le sugiere la conveniencia de aumentar el trabajo de mojar pieles a tres o cuatro días semanales. Arroyo se comunica también con Steinberg y le urge que tiene que venir inmediatamente debido al estado de huelga. Steinberg cablegrafía a Lobaugh para que le informe a los obreros que el paro en la producción es temporero y que cuando lleguen los productos químicos para la nueva fórmula se daría comienzo a la producción nuevamente. El estado de huelga continuó y Steinberg se trasladó a Puerto Rico, pero no visitó la tene-

ría.    Se comunicó con Lobaugh y le pidió que llevara al Hotel Condado, a dos o tres de los líderes de la huelga.    En esta reunión Steinberg llegó a un acuerdo con los trabajadores de pagarle un minimum de dos días semanales aunque no se realizara trabajo alguno.

El 20 de abril Steinberg telegrafía a Arroyo informándole del arreglo de la huelga, pero que no puede trasladarse a Mayagüez.    Arroyo se traslada entonces a San Juan donde conferencia con Steinberg.    Aparentemente quería plantearle los problemas que habían surgido en la tenería con motivo de la suspensión del proceso de curtimiento.

Es interesante apuntar que desde el 1ro. de marzo fecha en que entró en vigor el contrato hasta el 6 de junio siguiente cuando Arroyo despidió a Lobaugh, Steinberg nunca visitó la tenería.    Y ya sabemos que Lobaugh sólo le dedicaba unas horas diarias, pues tenía que atender a sus obligaciones en la Tenería González.

Con lo que queda expuesto de fondo, procede ahora considerar cada una de las violaciones que la corte a quo determinó había cometido Arroyo:

(a)  La primera, haber contratado un tenedor de libros y fijarle un salario de $40 semanales sin notificar de ello a Atlas, a pesar de que una de las obligaciones asumidas por Arroyo fue entregarle a Atlas el control, la posesión y la administración total de la tenería y de su negocio.    Pero es que el propio Steinberg admite que de acuerdo con lo pactado Arroyo estaría a cargo de las finanzas. (T. de E. págs. 2–237)  Y si era incumbencia de Arroyo estar a cargo de todas las finanzas, así como de todos los ingresos y egresos, nada más razonable que contratara un tenedor de libros de su confianza.    Después de todo, los gastos de administración y funcionamiento eran sufragados con fondos que proveía Arroyo.

(b) La segunda consistió en haber vendido en los primeros días de marzo, por su cuenta y sin haber notificado a Atlas, 20,000 libras de pieles de vaca.

En cuanto a esta supuesta violación nada hay en la prueba que establezca que esta venta fue hecha por Arroyo después del 1ro. de marzo, fecha en que entró en vigor el contrato. La prueba lo que revela es que el cargamento de pieles pesó 19,048 libras en Nueva York a principios de marzo, el día 8, para ser exacto, a donde llegó vía S/S Suzanne. Así, la realidad es que la evidencia no demuestra afirmativa y claramente que la venta de los cueros se llevó a efecto durante el mes de marzo, y por el contrario tiende a demostrar que posiblemente la venta se efectuó en el mes de febrero.

(c) Otro de los incumplimientos que se le imputan a Arroyo consiste en que en el contrato éste aseguró que el activo neto corriente de la tenería era por lo menos igual al revelado por el balance que se acompañó al contrato y que tiene fecha de 31 de julio de 1948, y el demandado nunca entregó este balance.

Entendemos que el no entregar este balance no era base suficiente para considerar un quebrantamiento del contrato tal que diera margen a la iniciación de un pleito por daños.

Pero además a las páginas 157-8 de la T. de E. (Pieza 2) aparece Lobaugh, testigo de los demandantes, manifestando que no se acuerda si Arroyo le mostró el balance a marzo 1ro. de 1949 y añade que no podría afirmar que no lo hizo.

La determinación que se hace por el tribunal de instancia al efecto de que habiendo determinado que Arroyo vendió 20,000 libras de pieles en marzo de 1949, era claro que el balance a marzo 1ro. de ese año tenía que ser inferior al de julio 31 de 1948 que se acompañó al contrato, no tiene base alguna en la prueba. En primer lugar hemos demostrado que nada hay que sostenga la determinación de que la venta

de las pieles fue durante el mes de marzo y en segundo lugar la conclusión es meramente una especulación pues concebiblemente, aún después de la venta de las pieles, el balance a marzo 1ro., 1949 pudo haber sido igual al de julio 31, de 1948. Todo dependía de la cantidad de pieles en existencia.

(d) El próximo quebrantamiento consistió en que Atlas requirió de Arroyo que prescindiese de los servicios de dos empleados, Martínez y Cancio y que transfiriese a otro Lugo Cintrón (Chino) a funciones de compra y venta de cuero a comisión.

En cuanto a este quebrantamiento bastaría decir que en relación con Martínez, Arroyo le notificó a Steinberg que tenía un contrato por tres años, que quizás él podía arreglar para darlo por terminado, pero aparentemente el empleado no estuvo conforme y Arroyo por tanto estaba impedido de separarlo. En cuanto a Lugo Cintrón (Chino) el propio Lobaugh como testigo del demandante manifestó que se cumplió con lo ordenado por Steinberg y que Lugo Cintrón fue transferido de empleo. Cuando Lugo rehusó aceptar la transferencia es el propio Lobaugh quien va a buscarlo para que se restituyera a su empleo. En relación con Cancio, repetimos aquí lo que antes dijimos, al efecto de que Cancio era un tenedor de libros que había sido escogido por Arroyo para que le ayudara en su encomienda de estar a cargo de las finanzas del negocio.

Refiriéndonos a las otras determinaciones de hecho relacionadas con el despido de un empleado y el cambio de turnos no hemos encontrado nada en la evidencia que justifique esa conclusión. Por el contrario, de la evidencia resulta el hecho de que las operaciones de la planta estuvieron suspendidas en espera de unos productos químicos. Además, de la evidencia surge (Exhibit 5 del demandante) que Steinberg se dirigió a Arroyo y no a Lobaugh para que dejara cesante a Martínez y a Cancio y transfiriera a Lugo Cintrón, reconociendo que Arroyo era la persona que estaba a cargo de la administración. El despido de Lobaugh lo discutiremos más adelante.

Pasemos a considerar las restantes infracciones que la corte a quo estimó constituían base para la acción incoada. El haber Arroyo vendido cuero vegetal a 42 centavos la libra cuando el precio era de 47 centavos; el no haber permitido que Lobaugh procesara 1,000 libras de cuero al cromo y el no haber suplido los $50,000 para capital de operaciones. Estas tres las discutiremos con el despido de Lobaugh como superintendente de Tenería Arroyo.

Para considerarlas es preciso recordar la situación imperante en la tenería a partir del 1ro. de marzo. Se suspende de todo el proceso de curtimiento de cuero vegetal en espera de unos productos químicos. No se prosigue con el curtimiento del cuero al cromo a pesar de que había facilidades para los dos procesos. Con motivo de la suspensión de las actividades los obreros se declaran en huelga. Y la persona seleccionada por Steinberg para administrar la tenería es la misma que está a cargo de una competidora. Además no tiene experiencia en curtir cuero al cromo según lo demuestran sus propias admisiones. Ver escolio 6. Arroyo, quien ha estado supliendo todo el dinero necesario para pagar los empleados y al propio Lobaugh, tiene que estar preocupado con la situación según se va desarrollando. Se ha suspendido el proceso de curtir y continúan los gastos generales. Entonces Lobaugh pretende hacer unos experimentos con una nueva fórmula. Arroyo es el que lo está exponiendo todo, pues el dinero que se gasta es de su peculio. Si bien el contrato establece que las pérdidas serán por igual entre Atlas y Arroyo, lo cierto es que posiblemente lo único que tendría Arroyo sería una acción judicial contra Atlas Corporation recientemente organizada.

Nos parece que la actuación de Arroyo fue razonable, dentro de las circunstancias prevalecientes. La tenería estaba prácticamente sin funcionar y se intenta iniciar unos experi-

mentos. Es entonces que Arroyo propone que no se haga nada nuevo hasta que él hable con Steinberg para aclarar la situación.

Así con esta situación, Arroyo decidió vender unas pieles a 42 centavos cuando se alega que el precio del mercado era de 47 centavos. En cuanto a que la venta la efectuó Arroyo, la evidencia tiende a demostrar como hemos apuntado anteriormente que Arroyo estaba interviniendo con la anuencia de Steinberg en la administración. Es a Arroyo a quien Steinberg se dirige para que deje cesante unos empleados. En cuanto al precio de 42 centavos, aparentemente la tenería González, la competidora, que era administrada por el propio Lobaugh, estaba en liquidación y vendió cuero a 42 centavos. Arroyo, que obviamente estaba necesitado de dinero para pagar los gastos fijos de la tenería, optó por vender al precio que estaba vendiéndose en aquel momento.

Refiriéndonos al hecho imputado a Arroyo de que no suplió la suma de $50,000 según alegadamente convenido, para capital de operación, Arroyo le escribió a Steinberg, según se expone en la determinación de hecho antes transcrita, explicándole su interpretación de la cláusula contractual. A esa comunicación Steinberg no contesta. Recuérdese que Arroyo es el que ha estado pagando todos los gastos de funcionamiento de la tenería por tres meses. Él estaba pues, cumpliendo con lo que había convenido. Al Steinberg no contestar su carta, podría arguirse que aceptó la interpretación que del contrato hacía Arroyo. Pero si así no fuera claramente Steinberg no estaba justificado en cruzarse de brazos y entonces al cabo de un tiempo incoar una acción para recobrar daños, cuando Atlas no había invertido ni expuesto nada y Arroyo era el que había invertido y expuesto todo.

Arroyo, nos parece, estuvo justificado en suspender a Lobaugh. Todo lo antes relatado justifica su actuación. Por su propia admisión, no es la persona experta que se convino en el contrato estaría a cargo del negocio. Ahora el hecho de que Arroyo actuara en la forma que actuó no sólo en lo relacionado con Lobaugh, sino en todas sus otras actuaciones, no justifica el iniciar un pleito como el presente. Steinberg debió haber tratado de solucionar sus diferencias con Arroyo. La evidencia demuestra que éste al principio estuvo en actitud de cooperar, y en efecto cooperó con el propio Lobaugh. Es después de transcurrido un período razonable que Arroyo empieza a preocuparse. El negocio está paralizado y él es el que está sufragando todos los gastos. Steinberg no visita la tenería y en una ocasión en que Arroyo puede hablar con él tiene que trasladarse a San Juan. Steinberg aparentemente asumió una actitud olímpica. No habla más con Arroyo, no se reunió a ver si podían allanar las diferencias existentes. Optó por demandar en daños por las ganancias dejadas de obtener.

No creemos que las actuaciones de Arroyo, vista su cooperación inicial, y su actitud de sufragar todos los gastos por tres meses, justificaran que Atlas no tratara de arreglar las diferencias existentes, y en cambio radicara una acción de daños.

No creemos que pueda afirmarse que la conducta de Arroyo fuera una "decididamente adversa al cumplimiento bona fide del contrato" como afirma el demandante. Como hemos dicho su actuación es una de cooperación. Acepta a Lobaugh a pesar de que trabajaba para una competidora, y sólo le dedicaba unas horas diarias a Tenería Arroyo, pagaba los empleados a pesar de que no se estaba produciendo nada, y demuestra su interés al construir una torre para agua y al solicitar los planos para los tanques adicionales. Se comunica con Steinberg cuando la huelga y le pide que venga a Puerto Rico para arreglar la situación obrera. Es sólo cuando se quieren hacer unos experimentos, luego de estar paralizada la

producción, que Arroyo le manifestó a Lobaugh que no prosiguiera hasta que él hablara con Steinberg. Por el contrario Steinberg no visita la planta desde el 1ro. de marzo en que empezó a regir el contrato y aparentemente después del 6 de junio fecha en que Arroyo despide a Lobaugh, no hay más comunicación entre Arroyo y Atlas. En forma alguna puede sostenerse que estos hechos demuestran que Arroyo no cumplió con lo pactado.

Todo lo expuesto nos conduce a concluir que el demandado Arroyo no incurrió en violación del contrato que diera margen a una causa de acción a favor de la demandante por incumplimiento. Bajo todas las circunstancias concurrentes no podemos descargar sobre sus hombros—en adición a la pesada carga que sobrellevó durante meses—las consecuencias que estimó el tribunal de instancia a base de meras insignificancias, y aún más, cuando se desprende que la propia entidad que cedió su causa de acción al demandante no estaba libre de toda mancha o pecado.

*Se revocará la sentencia que dictó el Tribunal Superior, Sala de San Juan, con fecha 25 de noviembre de 1957 y se declarará sin lugar la demanda. Se imponen $5,000 de honorarios de abogado a los demandantes.*